**UNITED STATES OF AMERICA**
**FOR THE DISTRICT OF MASSACHUSETTS**

CIVIL ACTION NO.:

_____

**WEI CHEN**
      Plaintiff,

v.

**DENIS MCDONOUGH, SECRETARY,**
**DEPARTMENT OF VETERANS AFFAIRS,**
      Defendant.

_____

**PLAINTIFF WEI CHEN'S APPEAL FROM DECISION OF THE MERIT SYSTEMS PROTECTION BOARD AND HIS DE NOVO COMPLAINT OF DISCRIMINATION IN FEDERAL EMPLOYMENT BASED ON HIS DISABILITY**

Plaintiff, Wei Chen, by and through his attorney, Marc J. Levy, Esquire, respectfully alleges, upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

## PARTIES

1. Plaintiff, Wei Chen ("Chen") is an adult individual who resides in the District of Massachusetts in Sudbury, Middlesex County, Massachusetts.  He is a former employee of the Department of Veterans Affairs and brings this action in response to the discriminatory actions taken against him by the Department of Veterans Affairs in terminating him from his employment.

2. Defendant VA at all times hereinafter mentioned, was and is an agency within the Federal Government with a facility located at 200 Springs Road, Bedford,

Massachusetts.  Denis McDonough is the current Secretary of the Department of Veterans Affairs.

## JURISDICTION AND VENUE

3.  The Court has original jurisdiction over Plaintiff's federal law claim pursuant to 28 U.S.C. §§ 1331 & 1343.

4.  Venue is proper pursuant to 28 U.S.C. § 1391.

5.  Plaintiff brings this action under 5 U.S.C. 7701 and 7702 and 29 C.F.R. 1614.310.

6.  Plaintiff brings this action pursuant to section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791).

7.  Venue is appropriate in the District of Massachusetts because Chen is a resident of the District of Massachusetts and because Chen was employed here by the Department of Veterans Affairs in Bedford, Middlesex County, Massachusetts in the District of Massachusetts.

8.  The jurisdictional prerequisites of 29 C.F.R. Part 1614.310 have been satisfied. Chen, as required by law, originally filed a mixed Complaint with the VA's Office of Resolution Management.  Upon receipt of a Final Agency Decision on that Complaint Chen filed an appeal to the Merit Systems Protection Board.

9.  Chen is afforded the right to file a complaint with the United States District Court as the Initial Decision of the Merit Systems Protection Board has become final and neither side has filed a Petition for Review.

**FACTS**

10. Plaintiff repeats and re-alleges each and every allegation contained herein.

11. Plaintiff, Wei Chen, was employed by the VA as a GS-12 Contract Specialist.

12. He was an employee as defined by 5 U.S.C. s. 7511(a)(1).

13. He was removed from his position on a charge of Misrepresentation of Arrival time

    effective April 22, 2019.

14. The removal alleges that on two days, September 5, 2018 and September 7, 2018,

    the Chen misrepresented his arrival time.

15. He appealed this removal by filing a formal complaint with the Agency's Office of

    Resolution Management on July 26, 2019. ORM accepted as a "Mixed Case"

    Complaint, the following claim for consideration:

    > "Whether the Agency unlawfully discriminated against Complainant
    > based on disability (traumatic brain injury, PTSD) when effective April
    > 22, 2019, he was removed from his Contract Specialist position."

16. ORM notified the Appellant that because his complaint constituted a mixed case"

    that the complaint was to be referred for a Final Agency Decision to the Agency's

    Office of Employment Discrimination (OEDCA).  OEDCA received the file on

    March 30, 2020. Following receipt of a Final Agency Decision, the Appellant was

    notified of his rights to file an appeal with MSPB.  A timely appeal was then

    initiated.

17. Following a hearing on the merits, the Merit Systems Protection Board ("MSPB")

    issued an Initial Decision ("ID") upholding the Agency's removal decision.  The

Initial Decision further found that although Chen had proven that he had been treated differently, he did not prove discrimination.  MSPB's Initial Decision became final on February 25, 2021 as neither party filed a Petition for Review with the Board[1].  A copy of that ID is attached hereto as Exhibit A.

18. Chen suffers from severe service-connected disabilities of which the VA was well aware.  Those disabilities included but were not limited to cognitive and emotional effects of a traumatic brain injury ("TBI") as well as Post Traumatic Stress Disorder ("PTSD").

19. Prior to the event at issue in this matter Chen had multiple approved Reasonable Accommodate ("RA") requests due to his PSTD, TBI and other health conditions.

20. One of those requests specifically provided Chen with additional time to complete his work assignments.

21. In light of this approved RA, Chen for years regularly arrived to work well before the official start of his tour of duty and he regularly worked well past the end of his tour of duty to complete his daily tasks.  Rarely, if ever, did Chen request overtime for these extra hours.

22. Chen's work as a contract specialist suited his disabilities perfectly.  He had very little need to interact with anyone when at work.  Chen could perform his contract work in his office, in solitude.

23. As a result of his disabilities, Chen did not utilize the VA's Lync/Skype messaging

---

1 It is noted that the MSPB currently has no sitting members to hear Petitions for Review and has not for over four years.  There is currently a backlog of over 2,000 cases awaiting review on PFR's whenever a quorum is back in place.

system on his computer as the constant "dinging" and the open source social platform invoked memories of his experience in Iraq when fellow soldiers of his were killed and severely maimed when enemy combatants would use cell phones to track their locations for mortar strikes.

24. Chen's not using the Lync/Skype messaging system was a non-issue for the Chen's prior supervisors.

25. However, after Judith Ruggiero became his supervisor sometime in late 2016, and despite knowing of his disability and why he was not using the Lync/Skype system, she nonetheless insisted he use the system.  When Chen informed her he would obtain an Reasonable Accommodation relative to the use of the Lync/Skye system (which he did), Ruggiero instructed Chen to start sending daily check-in and check-out emails.

26. Ms. Ruggiero wanted to use the Lync/Skype messaging system to monitor Chen's whereabouts during the day and when Chen was not on it, she devised another way to monitor his whereabouts.

27. Lync/Skype is not a time an attendance or employee monitoring system.

28. Time and attendance at the VA for Chen and others in his role was kept by exclusion.  In other words, an employee like Chen did not punch a time clock.  The employee is paid his/her 40 hour work week based on his/her tour of duty unless an approved leave request or other pay adjustment is submitted.

29. Ruggiero was well aware of Chen's disabilities and the reasons why he could not use the Lync/Skype system.  Not only did Chen have conversations with her about his disabilities when she became his supervisor, but Chen gave his RA request

regarding the Lync/Skype issue to Ruggiero to forward to the Agency's Designated Management Official.

30. No other employee prior to Chen was required to send daily check-in and check-out emails.

31. Chen was ordered to send check-in and check-out emails.  He was not given an option not to send daily check-in and check-out emails.

32. The use of daily check-in and check-out emails was not part of the Reasonable Accommodation provided by the Agency.

33. The RA simply indicated that Chen did not have to use the Lync/Skype system.

34. The use of daily check in and check out emails was not a practice utilized by the VA.

35. There is no VA policy or procedure governing the use of daily check-in and check-out emails.

36. Chen's disabilities made it difficult for him to remember to send his required daily check-in and check-out emails, which again only he was being required to perform.

37. In order to help him comply with the requirement, Chen began setting up delayed emails to make sure his required check-in and check-out emails would be sent at the start and end of his tour of duty even if he was at work well before and/or remained at work well after.

38. At some point, Ruggiero became aware that Chen was utilizing delayed emails. Rather than simply tell Chen to stop the practice, Ruggiero allowed it to continue as she embarked on an investigation into Chen's activities.

39. In June of 2018 Chen sent an email to Ruggiero's first and second line supervisors,

Ron Hirtle and Gerald Jacobs, along with Ruggiero, pleading for a meeting as he felt he was being treated unfairly.  In that email he made reference to the daily check-in and check-out emails.  In that email he made reference to his disabilities.  In that meeting he made reference to disparate treatment.

40. Upon receiving that email VA management sought the guidance of HR Specialist Mathew Mohr.  In response, Mohr provided specific instructions to 1) meet with the Appellant as requested; 2) send him written correspondence about the reasonable accommodation process; and 3) investigate Ruggiero's use of daily check-in and check-out emails as it relates to Chen because her having him, and him alone, send such emails was setting the Agency up for a disparate treatment claim.

41. In response to Mr. Mohr's instructions, Jacobs and Mr. Hirtle did none of the above.

42. A month later in July of 2018, Mohr reiterated his instructions to Hirtle and Jacobs. Still no action was taken.

43. This prompted Chen to send additional emails requesting a meeting with management.  Finally, a meeting was scheduled for September 5, 2018.

44. During the period where Chen was repeatedly requesting a meeting with management, Ruggiero and Mohr had separate direct communications in which Mr. Mohr specifically advised Ruggiero to simply instruct Chen to stop sending delayed emails if she found it problematic.

45. Ruggiero not only openly refused to follow this simple guidance, she lied to Mohr by telling him that sending check-in and check-out emails was part of Chen's Reasonable Accommodation determination.  It was not.

7

46. By way of this misrepresentation as to the RA determination, Ruggiero obtained Mohr's cooperation and assistance in her ongoing investigation into Chen's use of delayed emails in the hopes of building a fraud case to discipline him.

47. By way of that investigation, the VA ultimately issued a removal to Chen a removal charging him with misrepresenting his start time on two days, September 5, 2018 and September 7, 2018, through use of delayed check-in emails.

### FIRST CLAIM FOR RELIEF

(CHEN'S APPEAL OF THE FINAL DECISION OF THE MERIT SYSTEMS PROTECTION BOARD)

48. Plaintiff repeats and re-alleges each and every allegation contained herein.

49. The issues being raised by this Appeal from the Final Decision of the Merit Systems Protection Board are:

   A.   Whether the VA proved by substantial evidence its Charges and Specification against the Appellant.

   B.   Whether the VA proved by substantial evidence that Chen's removal from service promoted the efficiency of the service.

   C.   Whether Chen proved by preponderance of the evidence that he had been subjected to discrimination because of his disability.

   D.   Whether Chen proved by preponderance of evidence that the Agency's decision to terminate him was motivated by a discriminatory animus towards him based on his disability.

**SECOND CLAIM FOR RELIEF**
(CHEN'S DE NOVO COMPLAINT OF DISABILITY DISCRIMINATION)

50. Plaintiff repeats and re-alleges each and every allegation contained herein.

51. Plaintiff was discriminated against by Defendant on the basis of his disability in violation of Section 501 of the Rehabilitation Act of 1973.

52. Chen was a qualified employee with a disabling medical condition including but not limited to a Traumatic Brain Injury (TBI), Post Traumatic Stress Disorder (PTSD), Anxiety and Depression.

53. Notwithstanding those disabling medical conditions, Chen was able to perform the essential functions of his position with reasonable accommodations.

54. The VA discriminated against Chen in his employment because of his disability in violation of the Rehabilitation Act of 1973 when they subjected him to a discriminatory time and attendance requirement and then removed him from his position for allegedly not complying said discriminatory time and attendance protocol.

55. Chen has exhausted all administrative requirements before filing this *de novo* complaint of discrimination.

**WHEREFORE,** the Plaintiff demands the following relief:

a.    That this Court reverse and rescind the Final Decision of the Merit Systems Protection Board, which upheld the VA's Notice of Decision.

b.    That this Court direct the VA to remove all referenced to Chen's removal

from employment from his Official Personnel File and from any other files maintained by his supervisors and managers.

c.      That this Court direct the VA to retroactively reinstate Chen to his former position back to his date of separation with full back pay and benefits, front pay and all other economic benefits lost.

d.      That this Court enter judgment for the Plaintiff against the Defendant for all compensatory, emotional and psychological damages, injunctive relief, and any other damages permitted by law pursuant to the above referenced causes of action in an amount to be determined by a jury;

e.      That this Court award the Plaintiff all costs and expenses associated with this lawsuit;

f.      That this Court award the Plaintiff all attorney fees associated with this lawsuit;

g.      That this Court award the Plaintiff interest on any and all judgments awarded in this lawsuit; and

h.      For all other relief as this Court deems meet and just.

**The Plaintiff demands a jury trial on all issues triable by a jury.**

Respectfully Submitted,
The Plaintiff,
Wei Chen,
By his attorney,


*/s/ Marc J. Levy*

Marc J. Levy, Esquire
Marc J. Levy, Esquire LLC
215 Boston Post Road, Building B
Sudbury, MA 01776
Tel:  508-359-8600
Fax:  508-359-8601
Email:  marclevy@marclevyesq.com
Dated: 02/10/2021                              B.B.O. #644826

11

# Exhibit A

## UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
## NORTHEASTERN REGIONAL OFFICE

MR WEI CHEN,

           Appellant,

    v.

DEPARTMENT OF VETERANS
   AFFAIRS,

           Agency.

DOCKET NUMBER
PH-0714-20-0353-I-1

DATE: December 21, 2020

Marc J. Levy, Esquire, Sudbury, Massachusetts, for the appellant.

Jean M. Rummel, Esquire, Bedford, Massachusetts, for the agency.

**BEFORE**
Daniel F. McLaughlin
Administrative Judge

## INITIAL DECISION

Appellant Wei Chen appealed the decision of the Department of Veterans Affairs (agency) to remove him from employment based upon a charge that he misrepresented his start time.  Initial Appeal File (IAF), Tab 1; Tab 5 (p.p. 26-28 of 98).  The Merit Systems Protection Board (Board) has jurisdiction over this appeal under 38 U.S.C. § 714(c)(4)(A).  A hearing to consider the removal action and the appellant's disability discrimination affirmative defense was held on November 19 and 20, 2020, and closing arguments were presented by the parties on December 4, 2020.  IAF, Tabs 29-31 - Hearing Compact Discs (HCD).  For the reasons set forth below, the agency's removal action is AFFIRMED.

## ANALYSIS AND FINDINGS

Factual Background And Procedural History

At the time of his removal, the appellant was employed by the agency in the Competitive Service as a Contract Specialist, GS-1102-12, assigned to its Contracting Office located in Bedford, Massachusetts.  IAF, Tab 1 (p. 1 of 10); Tab 5 (p. 25 of 98).  The appellant is a 10 point preference eligible Veteran as a result of having sustained a service connected disability.  *Id.*

On April 1, 2019, the Division Chief of the agency's Network Contracting Offices 1 (NCO-1), Ronald W. Hirtle, issued the appellant a Notice recommending his removal based upon the Charge of Misrepresentation of Arrival Time.  IAF, Tab 5 (p.p. 82-85 of 98).  This Charge consisted of two Specifications.  *Id.*  The first Specification alleged, in relevant part, that:

> "[o]n September 5, 2018, Branch Chief, Judith Ruggiero was working at the Bedford VA Contracting Office (the "Office"). She arrived at the Office at 6:50a.m. and set up to work at a desk outside of your office. Ms. Ruggiero then checked your office to see if you were present in your office; she confirmed that you were not. At 7:01 a.m. Ms. Ruggiero received your daily "check-in" email. Your email indicated that you had arrived at the Office for duty that day. Immediately upon receipt, Ms. Ruggiero went to your office to speak with you. You were not in your office. At approximately 7:35a.m., Ms. Ruggiero witnessed you arrive at your office." *Id.* (p. 82-83 of 98)

This Specification went on to say that during a meeting with the appellant and his union representatives held two days later, Ms. Ruggiero asked him to explain how she could have received a daily check-in email from him at 7:01 a.m., if he did not report to work until 7:35 a.m.? *Id.*  In reply, the appellant is alleged to have said he was at his desk at 7:01 a.m. that day. *Id.*

The second Specification outlined a similar scenario with respect to events which were alleged to have transpired on September 7, 2018. *Id.* (p. 83 of 98). According to this Specification, Ms. Ruggiero arrived at the Bedford facility at

6:30a.m., and stopped by the appellant's office to find he was not there.  *Id.*
Then at 6:53 a.m., while she was sitting at a desk next to the appellant's office,
Ms. Ruggiero claims to have received a daily check-in email from him.  *Id.*  Upon
receipt of the email, Ms. Ruggiero says she went to the appellant's office and
again found he was not there.  *Id.*  She then checked the office a third time at the
start of the appellant's tour of duty at 7:00 a.m. and he was still absent.  *Id.*
Finally, at approximately 8:32 a.m., Ms. Ruggiero says she witnessed the
appellant arrive at work.  *Id.*  When asked when he reported to work on
September 7, 2018, the appellant is said to have told Ms. Ruggiero he had been at
his desk at 6:53a.m., and sent the email at that time.  *Id.*

In the Notice, Mr. Hirtle informed the appellant that based on the account
provided by Ms. Ruggiero and a review of certain technical data, he had
concluded that the appellant misrepresented his arrival times on those dates.  *Id.*
(p.p. 82-83 of 98).  As the Notice explained, the technical data showed that the
appellant had not logged into his computer on September 5, 2018 until 7:34 a.m.,
and did not login on September 7, 2018 until 8:37a.m.  *Id.*  As for how the daily
check-in emails could have been sent at 7:01 a.m. on September 5, 2018, and at
6:53 a.m. on September 7, 2018, if the appellant had not been in the office at
those times, Mr. Hirtle concluded that he had arranged to have those emails
automatically sent at those designated times by using a delayed delivery function
which did not need him to be on his computer.  *Id.*

Based upon the factual allegations outlined in the Specifications, Mr. Hirtle
told the appellant he was proposing to remove him pursuant to the authority
granted under 38 U.S.C. § 714 of the Department of Veterans Affairs
Accountability and Whistleblower Protection Act of 2017 (VA Accountability
Act).  *Id.* (p. 82 of 98).  The Notice also informed the appellant that the Director
of NCO-1, Gerald Jacobs, would decide whether to sustain the charge against
him, and whether to impose the recommended penalty of removal.  *Id.* (p. 84 of

98).   It also stated that he had the right to respond to the proposed removal by submitting a written and / or oral response to Mr. Jacobs.  *Id.* (p.p. 83-84 of 98).

The appellant took advantage of this opportunity to reply by making both an oral and a written response to the Notice of Proposed Removal.  IAF, Tab 5 (p. 26 of 98); Tab 30 (HCD – Testimony of Gerald Jacobs).   According to the Deciding Official, the appellant informed him he is a hard worker and a disabled Veteran.  IAF, Tab 30 (HCD – Testimony of Gerald Jacobs).  With respect to the allegation that he had misrepresented his arrival time, he recalled the appellant claiming the event logs showing his computer activity were not accurate because he had been in his office when the check-in emails were sent on September 5 and 7, 2018. *Id.*  As for Ms. Ruggerio not having seen him at his desk immediately after those emails had been sent, the appellant theorized she must have just missed him, because he had stepped out of his office right after sending them.  *Id.*

In his written response, the appellant again denied being absent from the office when the emails were sent.  IAF, Tab 20 (p. 18 of 37).  Although he admitted he had drafted the emails at some earlier point and scheduled them to be automatically distributed at a later time, he claimed he still needed to be in the office and logged into his computer for them to be sent.  *Id.*  In explaining why he had opted to have his computer send out prewritten automated check-in emails, rather than simply type and send them each morning, he explained it was due to his combat related medical conditions, which included Traumatic Brain Injury (TBI) and Post Traumatic Stress Disorder (PTSD).  *Id.* As a result of these conditions, he said he sometimes has difficulty remembering he has to send a check-in email every morning.  *Id.* Thus, to avoid getting into trouble for failing to send the emails, he said he arranged for the email server to automatically send them when he logs onto his office computer each morning.  *Id.*  Elaborating on how the automated check-in emails were sent, the appellant explained:

> "on my daily work, morning time, arrive my office, logon
> the computer, scheduled will automatic check-in…do my

> job then check-out, schedule next day's ch[e]ck-in email,
> logoff my computer, th[e]n go home." *Id.*

The appellant also used his written response to again emphasize that he is a hard worker who stays late in the office to ensure all of his assignments are completed. *Id.* He also claimed his immediate supervisor [Judith Ruggiero] is biased against him and does not trust him. *Id.*

On April 16, 2019, Mr. Jacobs issued a Letter of Decision informing the appellant that, after considering his oral and written replies, along with all of the evidence, he "found the charge of Misrepresentation of start time, as detailed in the Proposed Removal, is supported by substantial evidence." IAF, Tab 5 (p.p. 26-28 of 98). Mr. Jacobs went on to state that as a result of this determination:

> "I find the penalty of removal to be an appropriate level of
> penalty. Your position as a Contract Specialist requires
> the highest levels of integrity and honesty. The evidence I
> reviewed proves to me that you do not possess these
> necessary values. As a result, I have lost trust in your
> ability to perform your duties as a Contract Specialist."
> *Id.* (p. 26 of 98).

Based upon this decision, the agency proceeded to remove the appellant on April 22, 2019. *Id.* (p. 25 of 98). In terms of being able to challenge this removal, the agency explained in the Letter of Decision that he had a number of options, to include filing a petition for appeal directly with the Board. *Id.* (p. 27 of 28). Another option the agency told the appellant was available to him was:

> "9. <u>Equal Employment Opportunity Commission (EEOC):</u>
> If you believe this action is based on discrimination on
> the basis of race, color, religion, sex, national origin, age
> or handicap, you may file a complaint of discrimination or
> raise the issue of discrimination in any appeal to
> MSPB…If you elect to file a complaint of discrimination,
> you may do so by contacting the Office of Resolution
> Management (ORM) at 1-888-566-3982. Your complaint
> will be processed in accordance with EEOC regulations at
> 29 C.F.R., Part 1614. Your initial contact with the ORM

office must be done within 45 calendar days of the effective date of this action." *Id.* (p. 27 of 98).

The appellant challenged his removal by initiating contact with the agency's Office of Resolution Management (ORM) within 45 days of his removal and then filing a formal complaint of discrimination on July 26, 2019. IAF, Tab 1 (p. 8 of 20). The EEO related claim he raised in that complaint was:

> "[w]hether the Agency unlawfully discriminated against Complainant based on disability (traumatic brain injury, PTSD) when effective April 22, 2019, he was removed from his Contract Specialist position." *Id.*

After this claim was investigated, the agency's Office of Employment Discrimination Complaint Adjudication (OEDCA) reviewed the case and issued a Final Agency Decision (FAD) on June 24, 2020, in which it concluded that the appellant had failed "to show that the Agency discriminated against him based on his disability by terminating him from employment, as alleged." *Id.* (p.p. 8-18 of 20). The FAD also classified the appellant's discrimination claim as a mixed case complaint, and informed him that the decision "may be appealed…to the Merit Systems Protection Board (MSPB) (not the EEOC) within 30 calendar days of receipt of this decision…" *Id.* (p. 16 of 20). The appellant elected this option and filed an appeal with the Board the very next day. IAF, Tab 1.

In response to the appellant's appeal, the agency filed a motion to dismiss it for lack of jurisdiction. IAF, Tab 6. According to this motion, the appellant was required to file his appeal with the Board within 10 business days of the date of his removal. *Id.* The agency argues the Board does not have jurisdiction over the appeal because the appellant did not file it within that timeframe, but chose instead to first file a formal complaint of discrimination. *Id.* Although the agency had said in the Letter of Decision that filing a formal complaint of discrimination was an option available to the appellant, it argued in its motion that the VA Accountability Act does not toll

the 10 business day deadline for appealing to the Board in instances where such a complaint has been filed.  *Id.*

After considering the agency's motion, I denied it for reasons which will be explained in a later portion of this Decision.  IAF, Tab 7.  A video hearing concerning the issues raised in this appeal was conducted using Zoom for Government on November 19 and 20, 2020, and telephonic closing arguments were heard on December 4, 2020.  IAF, Tabs 29-31 - Hearing Compact Discs.

I.      Evidence and testimony presented by the parties concerning the misconduct charge

As part of the presentation of its case, the agency called Supervisory Contract Specialist Judith Ruggerio as a witness.  IAF, Tab 29.  She testified that in 2018, she had eight direct report employees, to include the appellant.  *Id.* (HCD – Testimony of Judith Ruggerio).  Because they were all remotely located at different facilities throughout New England, Ms. Ruggerio said she would monitor their attendance using the Lync, Skype and Teams software systems.  *Id.*

On April 18, 2017, the appellant submitted a Reasonable Accommodation Request seeking an "[e]xemption…not login to LYNC all the time except when it is necessary to use for meeting[s] or training."  IAF, Tab 16 (p.p. 44-45 of 109). The appellant explained he needed the requested accommodation because he suffers from combat related PTSD caused when three Soldiers in his unit were killed or injured in Iraq when one used a cell phone which allowed the enemy to locate and fire upon them.  *Id.* (p. 44 of 109).  As a result of this incident, the appellant says he experiences anxiety when he knows he is being tracked by online systems such as Lync.  *Id.*  Therefore, he proposed being allowed to us another "method (like email…) to keep 100% [ac]countability…"  *Id.*

Ms. Ruggerio testified she interpreted the appellant's suggestion that he be allowed to use an alternative method such as email to mean a willingness on his part to email her when he had arrived at his office in Bedford each workday.

IAF, Tab 29 (HCD – Testimony of Judith Ruggerio).  She also said that in 2018, the appellant was expected to start his tour of duty at 7:00 a.m.  *Id.*  Moreover, he did not have a telework or a flextime arrangement, and he did not have any job duties which needed to be performed away from his office.  *Id.*

She testified that beginning in the Spring of 2018, she began to suspect the appellant was not always in his office at the times his daily check-in emails were being sent, because she had received reports that he could not be located at the Bedford facility on certain mornings.  *Id.*  After looking into the appellant's email usage, she learned that many of his daily check-in messages were being created the day before and then set up to be sent by delayed delivery around 7:00 a.m. the following day.  *Id.;* and Tab 20 (p.p. 30-33 of 37).

While she acknowledged that there is no agency policy prohibiting employees from delaying the transmission of emails they have created, she eventually decided to visit the Bedford facility to ascertain whether the appellant was in fact in his office when his daily check-in emails were being sent.  IAF, Tab 29 (HCD – Testimony of Judith Ruggerio).  Therefore, she says when she went to the Bedford facility on the mornings of September 5, 2018 and September 7, 2018, she made it a point to assess his whereabouts.  *Id.*

Ms. Ruggerio's testimony concerning her visits to Bedford on those dates mirror the account given in the Notice of Proposed Removal.  *Id.;* and IAF, Tab 5 (p.p. 82-85 of 98).  According to Ms. Ruggerio, she arrived approximately 30 minutes before the appellant's scheduled start time on those days, and checked his office to confirm he was not there.  IAF, Tab 29 (HCD – Testimony of Judith Ruggerio).  She then sat with her computer at a desk located next to the appellant's office and waited for him.  *Id.*  Upon receiving a daily check-in email from the appellant's account (with the email on September 5, 2018 being sent at 7:01 a.m. and the one on September 7, 2018 being sent at 6:53 a.m.), she said she immediately went into his office but did see him.  *Id.*  She also testified that she never heard the appellant enter, exit or make any sounds in his office before,

during, and immediately after the daily check-in emails were transmitted. *Id.* It was not until 7:35 a.m. on September 5, 2018, and 8:32 a.m. on September 7, 2018, that she says she witnessed him arriving at the Bedford facility. *Id.*

Ms. Ruggerio also confirmed that the check-in emails sent on both days were set up by him for delayed delivery. *Id.* Based upon a report from the agency's Information and Technology (IT) office, the check-in email sent at 7:01 a.m. on September 5, 2018, was scheduled by the appellant at 9:24 p.m. the night before for a delayed delivery, and the email sent at 6:53 a.m. on September 7, 2018, had been scheduled by him at 4:01 p.m. on September 6, 2018 for a delayed delivery transmission. *Id.;* and Tab 5 (p. 31 of 98).

On cross examination, Ms. Ruggerio admitted she was not able to see into the appellant's office when she was sitting at the neighboring desk on the dates in question. *Id.* Furthermore, from her vantage point she says she could not see the front door to his office or see anyone who may be standing in front of the door. *Id.* She also acknowledged the appellant is not required to be at his desk throughout his entire shift, and that he is permitted to take a 30 minute lunch and two 15 minute breaks during the day. *Id.*

The agency also presented Kevin R. Klose, who serves as a Supervisory IT Analyst, to testify about the appellant's computer usage on September 5 and 7, 2018. IAF, Tab 29 (HCD – Kevin R. Klose). As part of this review, Mr. Klose discussed the meaning of the relevant logon codes which appear on a printout showing the activity of the appellant's assigned computer. *Id.;* and Tab 5 (p.p. 35-36, 52-80 of 88). With respect to these logon codes, Mr. Klose explained that:

> Logon Code 3 – Means a logon showing that the computer is being accessed from elsewhere on the network for such things as software updates. Such access does not require a user to be at the computer which is being accessed, but it does require the computer to be on.

> Logon Code 5 – Means a Service Control access which is performed by either a person or a program which is not the computer's assigned user.

Logon Code 7 – Means a user is accessing the computer which had been locked or timed out.

Logon Code 10 – Means an interactive remote logon.

IAF, Tab 5 (p.p. 46-51 of 98); Tab 29 (HCD - Testimony of Mr. Klose)

Mr. Klose testified that based upon these logon codes, a review of the records of the activity for the appellant's office computer for September 5, 2018, reveals that the first time he accessed it was at 7:34 a.m., when a Logon Code 7 first appeared.   IAF, Tab 5 (p.p. 52-62 of 98); Tab 29 (HCD – Testimony of Mr. Klose).   He further testified that the records reveal that the appellant did not access his office computer until 8:37 a.m. on September 7, 2018, because that was when the first Logon Code 7 appeared.[1]  IAF, Tab 5 (p.p. 63-80 of 98); Tab 29 (HCD – Testimony of Mr. Klose).

_____

[11] The technical records submitted by the agency reveal two Logon Code 7 entries for 7:34 a.m. on September 5, 2018, and two for 8:37 a.m. on September 7, 2018, with the entries on both of those dates being only a few seconds apart.  IAF, Tab 5 (p.p. 60-61, 79-80 of 98).  During the hearing, Mr. Klose testified that the duplicate codes represented the existence of a two factor authorization process for gaining access to the computer and the network, with the first Logon Code 7 entry on each of those mornings indicating the appellant had unlocked his office computer and the second entry showing the authorization for access via his Personal Identity Verification (PIV) Card.  IAF, Tab 29 (HCD - Testimony of Mr. Klose).   The appellant objected to this testimony on the grounds that when asked why there were duplicate Logon Code 7 entries during a deposition conducted on October 6, 2020, Mr. Klose testified he did not know, but then had an explanation when asked the same question during the hearing on November 19, 2020.  IAF, Tab 27 (p.p. 6-20 of 21); Tab 29 (HCD – Testimony of Mr. Klose); Tab 30 (HCD – Appellant's Objection).  During his hearing testimony, Mr. Klose said that while he did not know the reason for the duplicate codes when asked at his deposition, he later learned the reason.  IAF, Tab 29 (HCD – Testimony of Mr. Klose).  The appellant argued the agency's failure to reveal this new information violated Rule 26(e) Fed. R. Civ. P., which requires parties to supplement discovery responses whenever they learn of new information that is of a relevant nature. IAF, Tab 30 (HCD – Appellant's Objection).  While I agreed that the agency should have made the appellant aware of Mr. Klose's post deposition understanding as to the reason for the duplicate Logon Code 7 entries, I denied the appellant's request to strike the testimony in question.  IAF, Tab 30.  Instead, to remedy any possible prejudice to the appellant, I granted him the right to present a witness on December 4, 2020, to testify about the duplicate code entry issue.  *Id.*  The appellant elected not to exercise this right.  IAF, Tab 28; Tab 31.

The agency also presented the testimony of the Deciding Official, Gerald Jacobs, as part its case.  IAF, Tab 30 (HCD – Testimony of Gerald Jacobs).  With respect to his decision to remove the appellant, he said that before making it, he reviewed the Notice of Proposed Removal and all of the documentation contained in the accompanying evidence file.  *Id.*  He also said he considered the appellant's written and oral replies to the Notice of Proposed Removal.  *Id.*  He testified that after completing this review, he determined that, despite the appellant's claims to the contrary, he was not at work on September 5 and 7, 2018 when his delayed delivery emails were sent.  *Id.*  Mr. Jacobs said that as a result of this conclusion, he found that the appellant had misrepresented his start time as alleged in the Notice of Proposed Removal.  *Id.*

With respect to his decision to implement the recommend penalty of removal, Mr. Jacobs testified it was not an easy one to make.  *Id.*  Mr. Jacobs said that being a disabled Veteran himself, he is sympathetic to the appellant's struggle as a combat Veteran suffering from PTSD.  *Id.*  Despite his sympathy, Mr. Jacobs explained he ultimately decided removal was the most appropriate penalty because the appellant's position as a Contract Specialist and the fact he worked remotely meant that integrity is a vital quality to possess, and the appellant showed he lacked integrity when he lied about his attendance.  *Id.*  Mr. Jacobs further testified that he doubted the appellant had any rehabilitative potential because despite having been given many opportunities to admit his misconduct and demonstrate remorse, he continued to lie about when he had arrived at the office on the days in question.  *Id.*

In response to the agency's witnesses, the appellant claimed he had been in his office when the delayed delivery emails were sent on September 5 and 7, 2018.  IAF, Tab 30 (HCD – Testimony of the Appellant).  To explain why Ms. Ruggerio might have failed to see him immediately after the transmission of the delayed delivery emails on those dates, he summarized his typical morning schedule.  *Id.*  According to the appellant, he normally wakes up at 5:30 a.m. and

then leaves his house about 26 minutes later for a 15 to 20 minute commute to his Bedford office. *Id.* Upon arriving around 6:15 a.m., the appellant says he logs onto to his computer, which allows for the delay delivery emails to be sent at their preset designated times. *Id.* After doing so, he says he usually leaves the office to grab coffee, which may explain why Ms. Ruggerio failed to notice him. *Id.* He said he then he returns to receive that day's assignments, which Ms. Ruggerio generally sends him between 9:00 and 9:30 a.m. *Id.*

With respect to his activities on September 5, 2018, the appellant said he had been in his office until at least 9:24 p.m. the night before to finish his assignments and believes that before leaving, he closed the computer programs he had been on and then logged off of the computer. *Id.* Just before logging off, he says he arranged for a delayed delivery email to be sent at 7:00 a.m. on September 5, 2018. *Id.;* and Tab 5 (p. 31 of 98). While he does not recall the exact time he arrived at the office on September 5th, he believes it was around 6:53 a.m. IAF, Tab 30 (HCD – Testimony of the Appellant). He also believed he had arrived by 7:00 a.m. on September 7, 2018. *Id.* He further testified that the reason he believes he must have been at his office at the start of his shift on those days was because his delayed delivery emails could not have been sent if he is logged out of Outlook. *Id.* Because it was his normal practice to log out of Outlook at the end of each workday, he said his delayed delivery emails could not have been sent until he was on his computer in the morning. *Id.*

The appellant also repeated what he had said in his written reply to the Notice of Proposed Removal, by testifying that he had arranged for his daily check-in emails to be automatically sent when he logged onto his computer because he risked forgetting to send them due to memory problems caused by his combat related TBI. *Id.*

II.    Evidence and testimony presented by the parties concerning
       the disability discrimination disparate treatment claim

The appellant testified he has a 100% service connected disability and received an honorable medical discharge from the U.S. Army in 2010 after having served on active duty for four years.  IAF, Tab 30 (HCD – Testimony of the Appellant).  He explained his disabilities arose from his deployment with the 101st Airborne Division in Iraq where he suffered TBI and PTSD.  *Id.*  According to the appellant, some of the Soldiers in his unit had purchased Sim Cards for their mobile phones from local marketplaces in Iraq, and were not aware that the insurgents were using those cards to track them.  *Id.*  He says his PTSD developed after a Soldier answered a phone containing one of those Sim Card trackers and the insurgents were able to locate and launch mortars at his position, resulting in several members of his unit being injured or killed.  *Id.*

Ever since that incident, the appellant says he is scared to use social media platforms, such as Lync and Skype, or answer phone calls from unknown numbers.  *Id.*  He further testified that because Ms. Ruggerio wanted him to use Lync while at work, he submitted a Reasonable Accommodation Request on April 18, 2017, seeking an exemption.  *Id.;* and Tab 16 (p.p. 44-48 of 109).

Although he did indicate in this request a willingness to use another "method (like email ..) to keep a 100% [ac]countability…," he testified that he meant he had no objection to communicating by email.  IAF, Tab 16 (p. 44 of 109); Tab 30 (HCD – Testimony of the Appellant).  He did not, however, intend for that statement to mean he would use emails as a means for his supervisor to monitor his attendance.  IAF, Tab 30 (HCD – Testimony of the Appellant).

After being made to use the email system for attendance tracking for many months, the appellant says he finally decided to contact upper management to complain about what he considered to be an unfair requirement which he did not believe had been placed upon his co-workers.  *Id.*  Therefore, on June 15, 2018, he sent an email to Mr. Jacobs and Mr. Hirtle criticizing the attendance email

requirement, which he said constituted an unfair, dual standard.  IAF, Tab 16 (p.p. 72-73 of 109).

These managers sought advice on how to respond to the appellant from Human Resources Specialist Matthew Mohr.  IAF, Tab 16 (p. 72 of 109).  In an email sent on June 18, 2018, Mr. Mohr recommended they meet with the appellant to discuss his concerns.  IAF, Tab 16 (p. 74 of 109).  He also told them:

> "we'll need to look into Mr. Chen's claims about the emails and telephone calls. If Jodi is requiring Mr. Chen to email every morning to report that he's in, I hope that she is requiring EVERYONE to email to report ln. We might be setting ourselves up for an EEO if Mr. Chen is required to do these things but nobody else is ('disparate treatment')." *Id.*

Both Mr. Jacob and Mr. Hirtle admit they never met with the appellant to discuss his concerns.  IAF, Tab 29 (HCD – Testimony of Mr. Hirtle); Tab 30 (HCD – Testimony of Mr. Jacobs).  They also did not direct Ms. Ruggerio to stop requiring the appellant to check in every day via email.  *Id.*

Although he had initially raised a concern that the check-in email requirement might constitute disparate treatment, Mr. Mohr testified at the hearing that he did not know back in June of 2018 that Ms. Ruggerio was monitoring the attendance of her subordinates via Lync and Skype, and that she needed to use email to monitor the appellant's attendance because he had been granted a reasonable accommodation which allowed him not to use those social media platforms.  IAF, Tab 29 (HCD – Testimony of Matthew Mohr).

## Although The Appellant Did Not File His Appeal Within The 10 day Statutory Deadline, His Delay Is Excused Under The Doctrine of Equitable Tolling

The VA Accountability Act provides employees with the right to appeal removals to the Board, but specifies that any such appeal must be "made not later than 10 business days after the date of such removal…"  5 U.S.C. § 714(c)(4).

The appeal in this case was not filed within 10 business days of the appellant's removal, because he elected instead to initiate contact with an agency EEO Counselor within 45 days, and then file a formal complaint of discrimination pursuant to the EEO regulations set forth in 29 C.F.R., Part 1614.  IAF, Tab 1 (p. 8 of 20).   Even though the agency informed the appellant in the Letter of Decision that he had the right to challenge his removal by pursuing a claim of discrimination, it argues in its motion to dismiss that the Board lacks jurisdiction to consider the appeal because it was not filed within 10 business days as specified in 5 U.S.C. § 714(c)(4), and the VA Accountability Act does not stay this deadline to allow appellants to first seek redress through the EEO process.[2] IAF, Tab 6.  It further argues that the 10 business day filing deadline cannot be waived based upon a showing of good cause, and in making this argument, it mistakenly equates good cause with the completely different principle of equitable tolling.[3]  *Id.* (pp. 11-12 of 13).

The agency is correct when it argues that the VA Accountability Act does not toll the 10 business day filing deadline to allow impacted employees the right to first exhaust their administrative remedies through the EEO process. Moreover, the provisions which allow impacted employees to seek redress through the EEO process before filing an appeal with the Board are regulatory

---

[2] The agency's motion erroneously equates jurisdiction with timeliness.  IAF, Tab 6.  The United States Supreme Court has noted this mistake is a common one, which even it has made in the past.  *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 510, 126 S.Ct. 1235 (2006).  But the Supreme Court has since clarified that "time prescriptions, however emphatic, are not properly typed jurisdictional."  *Id.* (quoting *Scarborough v. Principi,* 541 U.S. 401, 414, 124 S.Ct. 1856 (2004)).

[3] The doctrines of good cause and equitable tolling apply different standards, with equitable tolling being a narrower doctrine.  *Gaetos v. Department of Veterans Affairs,* 121 M.S.P.R. 201, ¶ 5 (2014)(specifying the standard for showing good cause); *Heimberger v. Department of Commerce,* 121 M.S.P.R. 10, ¶ 10 (2014)(discussing the equitable tolling standard); *Kerr v. Merit Systems Protection Board,* 908 F.3d 1307, 1313 (Fed.Cir. 2018)(noting that equitable tolling is a narrower doctrine than that which is required to establish good cause).

rather than statutory in nature.[4]   The regulations which toll the appeal filing deadline while an EEO claim is being administratively exhausted must, therefore, yield to the statutory deadline specified in the VA Accountability Act, because whenever a regulation and a statute are in conflict, the statute must prevail.  *See U.S. v. Marte,* 356 F.3d 1336, 1342 (11th Cir. 2004) ("[W]here a regulation conflicts with a statute the regulation yields, not the statute.").   Thus, the appellant's petition for appeal is untimely because it was not filed within 10 business days of the date of his removal as required by the VA Accountability Act.

The doctrine of equitable tolling can be invoked in certain circumstances to excuse an untimely filed lawsuit against the Federal government.  *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95-96 (1990).  Although neither the Board nor the federal courts have ruled whether this doctrine applies to the filing deadline in section 714, a rebuttable presumption exists that statutory deadlines are subject to equitable tolling unless Congress specifies otherwise.  *Id.; and, Kirkendall v. Department of the Army,* 479 F.3d 830, 843 (Fed.Cir.2007).  Because the VA Accountability Act is silent as to the applicability of the doctrine of equitable tolling, I find it is available to the appellant and may be used to determine if it can cure the delay in filing his appeal.

When making this determination, it is important to note that equitable tolling does not extend to what is at best a "garden variety" claim of excusable neglect; rather, Federal courts have typically extended equitable relief sparingly, such as where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline

---

[4] 5 C.F.R. § 1201.154; and 29 C.F.R. §§ 1614.105(a)(1) and 1614.302(b) permit an appellant to have his EEO claims investigated by his agency before he files an appeal with the Board.

to pass.  *See Irwin,* 498 U.S. at 95-96; *Pacilli v. Department of Veterans Affairs,* 113 M.S.P.R. 526, ¶ 11 (2010).

In the present case, I find the doctrine of equitable tolling excuses the delay because the agency induced the appellant into missing the filing deadline by informing him in the Letter of Decision that if he filed a formal complaint of discrimination it would "be processed in accordance with EEOC regulations at 29 C.F.R., Part 1614."   IAF, Tab 5 (p. 27 of 98).   Included in part 1614 is a provision governing mixed case complaints which told the appellant that if he is "dissatisfied with the agency's final decision on the mixed case complaint…[he] may appeal the matter to the MSPB (not EEOC) within 30 days of receipt of the agency's final decision…"  *See* § 1614.302(d)(1)(ii).  The agency's reference to a regulation which contains such language prevents it from being able to dismiss as untimely any subsequent appeal filed within the deadlines specified in that regulation.   To decide otherwise would not be equitable because it would permit the agency to benefit from having misled the appellant.

Applicable Law Pertaining to Removals Taken Under 38 U.S.C. § 714

When the VA Accountability Act was signed into law on June 23, 2017, it greatly reduced the burden of proof the Department of Veterans Affairs must demonstrate to be able to discipline one of its employees for having engaged in misconduct.   Unlike the higher preponderance of the evidence standard other federal agencies must meet, the Department of Veterans Affairs need only prove its charges by substantial evidence.  38 U.S.C. § 714(d)(2)(A).

Substantial evidence is that degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree. 5 C.F.R. § 1201.4(p).  The Board's reviewing court has explained the "substantial evidence standard determines whether the decision could reasonably have been made, not whether it was correctly made."  *Merck & Cie v. Gnosis S.P.A.,* 808 F.3d 829,

840 (Fed. Cir. 2015).  To sustain an action based on substantial evidence, there must be "more than a mere scintilla of evidence," but a quantum "less than the weight of evidence" is all that is required.  *See Jones v. Department of Health & Human Services,* 834 F.3d 1361, 1366 (Fed. Cir. 2016).  Moreover, the agency need not present evidence that is more persuasive than evidence presented by the appellant. *Lovshin v. Department of the Navy,* 767 F.2d 826, 844 (Fed. Cir. 1985); *cert. denied,* 475 U.S. 1111 (1986); *Shuman v. Department of the Treasury,* 23 M.S.P.R. 620, 624 (1984).  Rather, under this deferential standard, if the record supports several reasonable, yet contradictory conclusions, a decision should not be overturned simply because one reasonable conclusion was selected over another.  *See In re Jolley,* 308 F.3d 1317, 1320 (Fed. Cir. 2002).

With respect to his affirmative defense, the appellant has the burden of proving it by preponderant evidence.  5 C.F.R. § 1201.56(b)(2)(C).  Preponderant evidence is defined as the degree of relevant evidence a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue.  5 C.F.R. § 1201.4(q).

<u>The Agency Has Proven The Charged Misconduct By Substantial Evidence</u>

The misconduct charge brought against the appellant in this appeal concerns misrepresentation.   "To establish a charge of misrepresentation, falsification, or lying, an agency must prove that the appellant: (1) supplied wrong information; and (2) knowingly did so with the intention of defrauding, deceiving, or misleading the agency for [his] own private material gain." *Gardner v. Department of Veterans Affairs,* 123 M.S.P.R. 647, ¶ 11 (2016).  Not only must an agency prove the falsification was committed with the intent to receive some form of "private material gain," but it must also establish "the false statement was material." *Leatherbury v. Department of the Army,* 524 F.3d 1293, 1300 (Fed. Cir. 2008).  "In general, a false statement is material if it has 'a natural tendency to influence, or is capable of influencing, the decision of the

decisionmaking body to which it was addressed." *Neder v. United States,* 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

The agency has proven the misrepresentation charge at issue in this appeal by substantial evidence. The appellant's claim that he was at his office when the delayed delivery emails were sent on September 5 and 7, 2018, is shown not to be true. The evidence proving he was not in his office when they were sent consists of two parts.

First, there is the credible testimony provided by the appellant's supervisor, Judith Ruggerio, in which she said that on both dates: (1) she arrived before the start of the appellant's 7:00 a.m. shift and, upon checking his office, confirmed he was not there; (2) she then waited at a desk next to the appellant's office and did not hear or see him in the facility; (3) upon receiving his check-in emails, she immediately entered his office and again found he was still not there; and (4) she witnessed the appellant finally arriving at the facility at 7:35 a.m. on September 5, 2018, and at 8:32 a.m. on September 7, 2018.

In contrast to her testimony, is the appellant's rather incredible claim that he managed to quietly enter and exit his office on both dates without Ms. Ruggerio noticing. This scenario is unlikely given Ms. Ruggerio's testimony that she was suspicious about his attendance and was keeping an eye out for him on those mornings. It is made even more unlikely when we consider the appellant's claim that he immediately left the office to grab coffee after logging onto his computer; an errand which apparently took him more than 30 minutes to perform on September 5th and an even more implausible 90 minutes on September 7th.

The second key piece of evidence is found in the technical data showing the appellant's computer activity on those dates. According to the logon codes contained in this technical data, the appellant first accessed his computer at 7:34 a.m. on September 5, 2018, and at 8:37 a.m. on September 7, 2018. IAF, Tab 5 (p.p. 52-680 of 98). Had the appellant's version of the events on those dates been accurate, then the technical data would have revealed Logon Codes showing he

had gained access at or before 7:00 a.m. on both of those dates.  No such Logon Codes can be found in the technical data.  Therefore, this technical data, when considered in combination with Ms. Ruggerio's testimony, is more than sufficient to satisfy the relatively low bar set by the substantial evidence standard and support the conclusion that the appellant had misrepresented his arrival times.

Not only did the appellant misrepresent the truth by sending automated delayed delivery emails to try to trick his supervisor into believing he was at work when he was not, but he again lied about his arrival times when Ms. Ruggerio met with him on September 7, 2018, and asked when he had reported to work on the days in question.

The appellant's misrepresentations about these matters were clearly intentional because he was aware of when he really had arrived at his office on those dates.  Moreover, I find he made these misrepresentations for his own private material gain so as to: (1) trick his supervisor into believing he was at work when he was not; and (2) avoid possible discipline for having sent deceptive delayed delivery emails after being confronted about them by management.

Because The Agency Has Met Its Evidentiary Burden, And The Choice Of Penalty Was Reasonable, The Removal Must Stand

With respect to Mr. Jacob's decision to remove the appellant, 38 U.S.C. § 714(d)(2)(B) provides that "if the decision of the Secretary is supported by substantial evidence, the administrative judge shall not mitigate the penalty prescribed…"  Although the Board lacks the authority to mitigate a selected penalty, it is required to assess whether the agency has shown by substantial evidence that the penalty is reasonable under the circumstances of the case.  *See Sayers v. Department of Veterans Affairs,* 954 F.3d 1370 (Fed. Cir. 2020).

In making this assessment, I find there is sufficient evidence to support the reasonableness of the penalty, despite the existence of certain mitigating circumstances such as the appellant's medical issues, his proud record of

distinguished military service, and the evidence showing he is a hard worker who strives to complete all of his assignments by the end of each day.

These same mitigating factors were considered by the Deciding Official, and while he testified he took them into account and has a great deal of sympathy for the appellant, he said he nevertheless removed him because the appellant had shown he could not be trusted. As Mr. Jacobs explained, his loss of trust in the appellant was not something which he could regard as being trivial, because integrity is an important quality expected of both Contract Specialists and employees who work remotely, and the appellant had demonstrated through his actions that he could not be trusted. Mr. Jacobs also found that the appellant had refused to admit his wrongdoing, and that this failure to take responsibility and show remorse for his actions indicated he was not a good candidate for rehabilitation.

The testimony provide by Mr. Jacobs concerning why he removed the appellant demonstrates it that his decision was a reasonable one. Accordingly, I find the choice of penalty is supported by substantial evidence.

<u>The Appellant Has Not Proven His Disparate Treatment Disability Discrimination Affirmative Defense</u>

Even in a case in which the agency meets its burden of proof, the Board cannot sustain the disciplinary action if the appellant establishes an affirmative defense by a preponderance of the evidence. 5 U.S.C. § 7701(c)(2). In this appeal, the appellant raised the affirmative defense that the agency decision to remove him was due to his disability.

The Rehabilitation Act of 1973 protects federal employees from being subjected to disparate treatment on the basis of disability. The Board has held that a violation is established where the appellant shows that discrimination "was a motivating factor in the contested personnel action, even if it was not the only reason." *Savage v. Department of the Army*, 122 M.S.P.R. 612 ¶¶ 41 (2015).

To establish his disparate treatment disability discrimination claim, the appellant must first prove he has a disability, and then demonstrate by preponderant evidence the agency discriminated against him on the basis of that disability. The existence of the appellant's TBI and PTSD are not in dispute, nor is there any doubt that these conditions constitute disabilities within the mean of the Rehabilitation Act. Therefore, the only question which remains is whether the appellant's disabilities were motivating factors in the removal action.

The appellant may meet his burden to establish he was subjected to discrimination based upon disability in several ways. One way is by introducing direct evidence of discrimination. *Savage,* 122 M.S.P.R. 612, ¶ 42. Direct evidence of discrimination may be any statement made by an employer that: (1) reflects directly the alleged discriminatory attitude and (2) bears directly on the contested employment discrimination. *Arredondo v. U.S. Postal Service,* 85 M.S.P.R. 113, ¶ 13 (2000). It is evidence, that, if believed, proves the existence of a fact in issue without inference or presumption; however, such evidence is composed of "only the most blatant remarks, whose intent could be nothing other than to discriminate" on the basis of some impermissible factor. *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1266 (11th Cir. 1999). If an alleged discriminatory statement at best merely suggests a discriminatory motive, then it is only circumstantial evidence. *Id.* An appellant with direct evidence of discrimination will prevail on his discrimination claim if he establishes that improper motivating factors played a part in the agency decision. *Arredondo,* 85 M.S.P.R. 113 at ¶ 13.

The appellant may also meet his burden through circumstantial evidence. Circumstantial evidence is evidence that may support an inference that intentional discrimination was a motivating factor in an employment action. The Board has identified three types of circumstantial evidence. The first kind "consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn."

*Savage,* 122 M.S.P.R. 612, ¶ 42, quoting *Troupe v. May Department Stores Company,* 20 F.3d 734 (7th Cir. 1994). Considered together, such bits and pieces may compose "a convincing mosaic of discrimination." *Id.* at 736-737. Second is comparator evidence, consisting of "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic...on which an employer is forbidden to base a difference in treatment received systematically better treatment." *Id.* Third is evidence that the agency's stated reason for its action is "unworthy of belief, a mere pretext for discrimination." *Id.* "Each type of evidence…is sufficient by itself...to support a judgment for [the employee]; or they can be used together." *Id.*

If the appellant does make the required showing, then the burden shifts to the agency to show, also by preponderant evidence, that it would have taken the action even if it lacked such a motive. *Gerlach v. Federal Trade Commission,* 9 M.S.P.R. 268, 273 (1981). "If we find that the agency has made that showing, its violation…will not require reversal of the action." *Savage, Id.* at ¶ 51.

A review of the evidentiary record in this appeal confirms the appellant's supervisors were aware of his disability. Despite this awareness, there is no direct evidence of disability discrimination. As for the existence of circumstantial evidence of such discrimination, the appellant relies upon comparator evidence by pointing out that the agency treated him differently because he was the only employee supervised by Ms. Ruggerio who was required to check-in with her each morning via email. While this evidence does show he was in fact treated differently from his co-workers, the agency has provided a legitimate non-discriminatory explanation for the check-in email requirement.

According to Ms. Ruggerio, her employees are scattered across New England and to monitor their attendance, she relies on systems such as Lync, Skype and Teams. Because the appellant asked and was permitted not to use those systems, she decided that to be able to monitor his attendance he would need to check in via email.

Ms. Ruggerio's explanation is a reasonable and non-discriminatory one. Managers are expected to track the attendance of the employees they supervise, and given Ms. Ruggerio's geographically dispersed workforce it would be sensible for her to use systems such as Lync or email to perform this monitoring function.  Moreover, the requirement placed upon the appellant to use email to check in each day, while his co-workers used Lync, is hardly an onerous one, and it is credibly explained by fact he experienced anxiety issues which made it difficult for Ms. Ruggerio to track him by Lync.

As for the decision to remove the appellant, the agency says it took this action because he misrepresented his attendance on two dates in September of 2018.  Given the explanation provided by the Deciding Official concerning his choice of penalty, I find the agency would have removed appellant for this misconduct even if he had not been disabled.

After assessing the appellant's claims in accordance with the standards identified by the Board in *Savage v. Department of the Army,* I find the appellant has not proven his affirmative defense by a preponderance of the evidence, and I further find, that the agency's explanation for why it removed the appellant is worthy of belief and not a pretext of discrimination.

While the appellant has not established his affirmative defense, the agency has demonstrated through substantial evidence that he engaged in the alleged misconduct and that the penalty of removal was a reasonable one.  Therefore, the agency's action must be AFFIRMED.

## DECISION

The agency's action is AFFIRMED.


FOR THE BOARD:                    _____
                                 Daniel F. McLaughlin
                                 Administrative Judge

## NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the parties may file a settlement agreement, but the administrative judge may vacate the initial decision in order to accept such an agreement into the record after that date. *See* 5 C.F.R. § 1201.112(a)(4).

## NOTICE TO APPELLANT

This initial decision will become final on **January 25, 2021**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

## NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently there are no members in place. Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time. *See* 5 U.S.C. § 1203. Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least two members are appointed by the President and confirmed by the Senate. The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

## Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to

warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the

pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date this decision becomes final.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after this decision becomes final under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and

to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above.  5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S.

Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

<u>http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx</u>